**HELLS CANYON PRESERVATION
COUNCIL, et al., Plaintiffs,**

v.

**Carol H. JACOBY, et al., Defendants.**

**No. CIV. 97–1722–AA.**

United States District Court,
D. Oregon.

May 8, 1998.

Adam J. Berger, Patti Goldman, Attorneys at Law, Seattle, WA, Jack K. Sterne, Jr., Attorney at Law, Camp Sherman, OR, for Plaintiffs.

Kristine Olson, United States Attorney, Thomas C. Lee, Arno Reifenberg, Asst. United States Attorneys, James F. Zotter, Attorney at Law, Federal Highway Administration, Portland, OR, for Defendants.

## OPINION AND ORDER

AIKEN, District Judge.

Plaintiffs bring this action challenging the decision of Carol H. Jacoby, Division Engineer of the Western Federal Lands Highway Division of the Federal Highway Administration, the Federal Highway Administration (FHWA), and the United States Forest Service (USFS) to proceed with the reconstruc-

tion of the Gumboot Creek portion of Forest Development Road 39 (FR 39) in the Hells Canyon National Recreation Area (HCNRA) without first preparing either an environmental assessment (EA) or an environmental impact statement (EIS). Plaintiffs are also challenging the USFS's decision to deny plaintiffs access under the Freedom of Information Act to cost estimates for the repair and/or replacement of FR 39. Plaintiffs allege that defendants' decisions violate the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, the Freedom of Information Act, 5 U.S.C. § 552, and the Administrative Procedures Act, 5 U.S.C. §§ 701–706. Plaintiffs seek declaratory and injunctive relief, costs, and attorney's fees.

Before the court is plaintiffs' motion for summary judgment and permanent injunction (# 11). Plaintiffs seek a declaration that the decision to proceed with the reconstruction and/or repair of FR 39 without first preparing either an EA or an EIS, and without considering a reasonable range of alternatives, is arbitrary and capricious, because the reconstruction may have significant direct, indirect, cumulative, and long-term impacts to populations of chinook salmon and steelhead, which are listed as threatened species under the Endangered Species Act (ESA). Plaintiffs also seek a permanent injunction prohibiting the advertisement, award, or construction of the FR 39 project pending compliance with NEPA.

Also before the court is defendants' motion for summary judgment (# 34). Defendants contend that they have complied with NEPA and properly found that a Categorical Exclusion (CE) applied and that there were no unusual circumstances. Defendants request that the court grant their motion for summary judgment and deny plaintiffs' motion for summary judgment and their request for a permanent injunction.

## Consideration of Materials Outside the Administrative Record

Defendants object to plaintiffs' submission of evidence outside the administrative record. Generally, judicial review of an agency decision is limited to review of the administrative record before the agency at the time of the decision. *Thompson v. U.S.*

*Dept. of Labor,* 885 F.2d 551, 555 (9th Cir. 1989). This standard of review is applicable to the review of agency actions in NEPA cases. *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988), *amended,* 867 F.2d 1244 (9th Cir.1989).

Certain circumstances may justify expanding review beyond the record. *National Audubon Society v. U.S. Forest Service,* 46 F.3d 1437, 1447 (9th Cir.1993). The reviewing court may go outside the record to consider evidence relevant to the substantive merits of an agency decision: 1) to determine whether the agency considered all relevant factors, *Thompson,* 885 F.2d at 555; 2) to determine whether the agency's "course of inquiry was sufficient or inadequate," *Alpine Lakes Protection Society v. U.S. Forest Service,* 838 F.Supp. 478, 481 (W.D.Wash.1993) (citations omitted); 3) when it is necessary to explain the agency's action; 4) when the agency has relied on evidence outside the record; 5) to explain technical terms or complex subject matter; or 6) when there is a showing of agency bad faith, *National Audubon Society,* 46 F.3d at 1447 fn. 9. "[A]llegations that an EIS has failed to mention serious environmental consequences, failed to adequately discuss some reasonable alternative, or otherwise swept 'stubborn problems or serious criticisms ... under the rug,' raises issues sufficiently important to permit the introduction of new evidence in the District Court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination that no such statement is necessary." *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1384–1385 (2nd Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978)(adopted by the Ninth Circuit in *Animal Defense Council*).

The plaintiffs have alleged that the agencies involved in this decision have failed to properly consider relevant environmental consequences and the presence of other unusual circumstances such as: 1) likely signifi-

cant impacts on threatened chinook and steelhead; 2) substantial controversy between the project proponents and other expert agencies regarding those impacts; 3) the potential inconsistency of the project with the ESA, state and federal water quality laws, and other legal requirements; 4) the existence of reasonable, unexamined alternatives that would reduce the threatened impacts; 5) the presence of steep slopes and highly erosive soils; and 6) the presence of flood plains and wetlands. These allegations are sufficient to allow the introduction of evidence outside the record.

### Second Declaration of Jon Rhodes

Defendants, at oral argument, asked the court to disregard the second declaration of Jon Rhodes, arguing that his testimony has not been qualified under the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The issue of an expert's qualifications is governed by FRE 104(a) and FRE 702. *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1123 (9th Cir.1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995).[1] Under *Daubert* the court must engage in a two-part test to determine the admissibility of scientific expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (9th Cir.), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). First, the court must determine whether the expert's testimony reflects scientific knowledge, whether the findings are derived by the scientific method, and whether their work product amounts to good science. *Id.* Second the court must determine whether the proffered testimony would assist the trier of fact to determine facts at issue in the case. *Id.*

"[I]n order to qualify as scientific knowledge, an inference or assertion must be derived by the scientific method." *Id.* at 1316 (citation omitted). To determine

1. Rule 104(a) provides, in part, that preliminary questions concerning the qualification of a person to be a witness shall be determined by the court. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

whether scientific testimony is derived from the scientific method or is based on scientifically valid principles, the party presenting the expert testimony must show that the expert's findings are based on sound science, which requires some objective, independent validation of the expert's methodology. *Id.* Several factors the court may consider in making this determination include the following: "1) whether the theory or technique employed by the expert is generally accepted in the scientific community; 2) whether its been subjected to peer review and publication; 3) whether it can be and has been tested; and 4) whether the known or potential rate of error is acceptable." *Id.* at 1316 (citation omitted).

 In determining whether the analysis underlying the expert's testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions, the court should consider "whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Id.* at 1317. The fact that an expert is testifying "based on research that he has conducted independent of the litigation provides important objective proof that the research comports with the dictates of good science." *Id.*

 If the testimony is not based on independent research, the party offering the testimony must come forward with other objective, verifiable evidence that the testimony is based on valid scientific principles. *Id.* at 1317–1318. One way of showing this is to offer proof that the research and analysis supporting the conclusions have been subject to peer review and publication. *Id.* at 1318. Another way is for the expert to explain precisely how they went about researching their conclusions and point to some objective source to show that they have followed the scientific method, as practiced by a recognized minority of scientists in their field. *Id.* at 1318–1319.

 Mr. Rhodes incorporates his qualifications from his first declaration into his second declaration. Mr. Rhodes co-authored two papers on the effects of forest management activities on salmon habitat. (Rhodes Declaration at 13). In his first declaration, he also cites a number of other scientific studies and administrative documents which he relied upon in forming his opinions. *Id.* In his second declaration, he states that he reviewed the updated BA. Based on his review of this document and his own professional work experience, he gave his opinion regarding the deficiencies and flaws contained in the updated biological opinion. It appears that Mr. Rhodes' second declaration, when viewed in conjunction with his first declaration, does meet the *Daubert* requirements. *Daubert,* 43 F.3d at 1318–1319. It also appears that his testimony is relevant to the issues in this case. Therefore, the court will consider his second declaration.

## I. *FACTS*

Gumboot Creek, a tributary of the Imnaha River, is located in the HCNRA within the Wallowa–Whitman National Forest (WWNF). Gumboot Creek provides spawning and rearing habitat for summer steelhead, which has been listed as a threatened species under the Endangered Species Act (ESA), and is a designated critical habitat for spring/summer chinook salmon, which are also listed as a threatened species under the ESA. (Berger Dec. Ex. 2 at 3, 7; Berger Dec. Ex. 3 at 1). The Imnaha River provides spawning and rearing habitat for both steelhead and chinook, and also is designated critical habitat for listed chinook. (*Id.*). The Imnaha River is designated under the Federal Wild and Scenic Rivers Act.

FR 39, also known as the Wallowa Mountain Loop Road, is a two-lane paved road within the WWNF and HCNRA, connecting Joseph and Halfway, Oregon. (AR 810). FR 39 is a forest development road[2]. Portions of FR 39 run along Gumboot Creek. FR 39 provides recreational access to the HCNRA and is a seasonal transportation artery between the towns of Halfway and Joseph. (Berger Dec. Ex. 1). FR 39 is essential to the economies of the local communities, such as Joseph, Halfway, Pine Creek, and Richland, that are heavily depen-

---

**2.** This is included based on plaintiffs' first objec- tion to defendant's concise statement of facts.

dent on recreation, tourist, and sportsman trade. (AR 11–26, 378, 551, 816–848, 856).[3]

The January 1, 1997 flood, which exceeded 100 year flood levels, severely damaged FR 39 at various locations, and closed the road to public travel. The damage included 24 sites within a 4.6 mile section of FR 39 along Gumboot Creek. (Berger Dec. Ex. 1 pg.1). The damage to FR 39 included "material slumping into the roadway, cut and fill failures, roadway shoulder erosion, washouts of the road drainage crossings, and series of debris torrents that washed out approximately 3/4 of a mile of road prism." (Berger Dec. Ex. 3 ).[4]

The USFS requested that the FHWA develop and administer a project using federal emergency relief funds under 23 U.S.C.

§ 125 to restore and reopen FR 39. (AR 78–89). The USFS and FHWA subsequently agreed to repair FR 39 under the Emergency Relief for Federally Owned Roads (ERFO) program. (Id.). FHWA was designated the lead agency for the project for purposes of NEPA. (Berger Dec. Ex. 9 at 11).[5] Public meetings were held in Halfway and Oxbow, Oregon, on February 21, 1997, to discuss the repair and restoration of FR 39. (AR 32–33).

The initial ERFO proposal called for rebuilding FR 39 in kind, with realignments up to 40 feet away from the stream at those sites where flooding had most damaged the road. (Berger Dec. Ex. 10). The initial proposal also indicated that FHWA was conducting a survey to raise the grade of the

---

**3.** In their second objection to defendant's concise statement of facts, plaintiffs object to this statement on the grounds that defendants have not produced any objective, quantifiable evidence of the importance of FR 39 to the economies of the local communities. The record amply supports this statement based on the following evidence that is cited by defendant: The city of Halfway has expressed to the Forest Service that the city greatly depends on FR 39 being open during the summer months for tourism and during the fall for hunters. The city has stated that Halfway, Pine Creek, and Richland count on FR 39 for their survival during the summer tourism months and the fall hunting season. (AR 11). Both Senators Smith and Wyden have expressed concerns that the local economy will be damaged if the reconstruction of FR 39 is delayed. (AR 378). In the town of Joseph, merchants told federal agencies that they lost approximately 15% of their profits over the summer because of the closure of FR 39. (AR 551). Both Joseph and Wallowa Lake have incurred economic damages because of the closing of FR 39. (AR 819). Loss of FR 39 has had a negative impact and imposed continued hardships on the Wallowa County community. (AR 817). Local residents signed a petition asking NMFS to give the highest priority to consideration of the repair of FR 39. (AR 820). The Baker County Chamber of Commerce also expressed the belief that FR 39 was a very vital economic link for Wallowa and Baker Counties. (AR 836). The Baker County Visitor and Convention Bureau stated that the closure of FR 39 was having a significant impact on the economic stability of Wallowa and Baker Counties, and the communities of Oxbow, Pine Creek, Halfway, and Richland. (AR 837). Many businesses were reporting a 20–30% decrease in customers. (Id.). The Joseph Chamber of Commerce also expressed that businesses had an 18% decrease in sales during the summer tourist season. (AR 843). A local art gallery and framing business in Joseph expressed concern over the loss of business traffic and tourist sales due to the road closure. (AR 842). The owners of the grocery store in Joseph also reported a decrease in customers and a 20% loss in revenues since the road closure. (AR 846). The businesses of Halfway and Pine Creek have suffered a serious decline due to the road closure. (AR 856).

**4.** Defendants object to the sentence in plaintiffs' concise statement of facts that begins with "Catastrophic flooding and landslides ...". Plaintiff cites to Berger Dec. Ex. 1 at 1—the exact language of that exhibit states: " A catastrophic rain on snow event on 1/1/97 damaged approximately 24 sites along a 4.6 mile portion of the Gumboot section of Road 39." Plaintiff also cites to Berger Dec. Ex. 3 at 5—the language of this exhibit states that: "The damage to the Gumboot Road included material slumping into the roadway, cut and fill failures, roadway shoulder erosion, washouts of the road drainage crossings, and a series of debris torrents that washed out approximately 3/4 of a mile of road prism." This statement was included instead of the statement in plaintiffs' concise statement of facts and instead of the following two statements put forth by the defendant because this statement is a more accurate reflection of the record than any of the offered statements. Defendants' statements: The flood damage consisted primarily of washouts of the roadway and large debris deposits from drainages above the road and portions of the Gumboot Creek road were damaged by debris avalanches which scoured drainage above the road and deposited large quantities of earth, rock, and wood on the roadway (AR 264–277, 757–788).

**5.** Plaintiffs object to the defendants' characterization that NEPA regulations dictate that FHWA would be the lead agency. The court used plaintiffs' version of the fact that FHWA was designated the lead agency.

most damaged section by 25 to 30 feet, with significant realignment away from the stream channel. (Id.). The agency also proposed the removal of log jams and other large instream woody debris. (Id.).

Since Gumboot Creek has been designated by the National Marine Fisheries Service (NMFS) as critical habitat for spring/summer chinook salmon, and is also important spawning and rearing habitat for steelhead, which was listed as an endangered species on August 17, 1997, the USFS prepared a Biological Assessment (BA) pursuant to the ESA on the impacts of the proposed repairs to threatened species. (AR 673).

The initial BA, dated March 31, 1997, stated that "the project will change the risk of adverse effects on designated critical habitat and the May Affect, Not likely to Adversely Affect determination within the cumulative effects analysis for Forest Service Actions. This is due to the potential for instream channel work to occur during spawning through emergent periods for spring/summer chinook salmon and summer steelhead trout. As a result, this project with combination of other Forest Service Activities could increase mortality, which would cause adverse modification or destruction of spring/summer chinook and steelhead populations within designated critical habitat." (Berger Dec. Ex. 2 at 15–16). In summary, the BA stated that: "The 1997 Flood Repair Project MAY AFFECT, LIKELY TO ADVERSELY AFFECT spring/summer chinook salmon and summer steelhead trout or result of moderate to high direct and indirect effects from the fine sediment release during the spawning through emergence periods, direct mortality to spawning, incubating, and pre-emergent spring/summer chinook and steelhead, and an increased risk of adverse cumulative effects on populations within designated critical habitat." (Id. at 18). The BA also stated that if instream work were done between July 15 and August 15, the project would not likely adversely affect listed steelhead and salmon and their habitat. (Id. at 18–19). FHWA transmitted the BA for anadromous fish to the NMFS on April 8, 1997, and

requested formal consultation for the listed spring/summer chinook salmon and the summer steelhead trout, which was proposed for listing.

Jon Rhodes, M.Sc., an expert for plaintiffs, opines that the initial BA provided almost no evaluation of the long-term impacts of sediment delivery caused by reconstruction and keeping portions of the road in the flood plain and relatively close to Gumboot Creek. (Rhodes Dec ¶ 23).

The NMFS sent FHWA a draft section of a Draft Biological Opinion, for its review and consideration, prior to the field reviews and meetings on the proposed repair of FR 39 scheduled for October 7–9, 1997, in Enterprise, Oregon. (AR 538–549).[6] The draft section of the Draft Biological Opinion states that:

"Potential effects to spring/summer chinook salmon and steelhead habitat populations include:

1) increased sediment production and delivery;

2) floodplain encroachment along Gumboot Creek;

3) stream channelization from bank stabilization measures;

4) stream channelization resulting from channel relocations;

5) extensive rip-rapping of streambanks;

6) removal of instream large woody debris (LWD);

7) stream gradient increases resulting from channel simplification;

8) vulnerability to future flood events with similar results;

9) increased potential of fuel spill; and

10) timing of instream work activities.

The NMFS has identified several essential features of critical habitat that could be affected from the actions as proposed. Key elements include: water quality, substrate characteristics, food for juveniles, and cover/shelter, including LWD."

(Berger Dec. Ex. 3 at 1).

The draft BO also points out that the draft BA did not use predictive modeling of sedi-

---

**6.** Defendants object to the portion of plaintiffs' concise statement of facts that starts with "The National Marine Fisheries Service ("NMFS") prepared a draft Biological Opinion . . . ." Defendant points out that this was a draft section of a draft biological opinion. The court changed this fact based on defendants' objection.

ment production and delivery to compare relative impacts of the proposed project over natural conditions. (Id. at 5–6).

On October 7, 1997, FHWA, USFS, and NMFS met in Enterprise, Oregon, to discuss the proposed design, portions of the draft BO on the proposed design, and alternatives. (AR 557–558). FHWA consulted with NMFS with regard to its proposal to repair the damaged sites along Gumboot Creek. During the consultation process, NMFS raised some concerns with the proposals possible impacts on chinook salmon and steelhead. As a result FHWA, USFS, and NMFS reviewed, in the field, the damage sites along Gumboot Creek during October 7–9, 1997, and discussed possible alternatives to avoid any adverse effects on chinook salmon and steelhead.[7] (AR 518–523, 536–537, 538–549, 552, 556, 557–562). The federal agencies agreed on an alternative, which, among other things, shifted the damaged sections of the road away from Gumboot Creek at 14 sites, and used retaining walls rather than riprap fills at two other sites. The agencies agreed to prepare a new BA of the revised design. (AR 146–147, 470, 491, 505–517, 518–523, 536–537, 538–539, 550, 552, 556, 557–562, 576)[8]. The agencies held a public meeting in Joseph, Oregon, on October 9, 1997, to inform the public of the revised proposal and the proposed schedule for repairing and reopening FR 39. (AR 551, 559–561).

FHWA formally notified NMFS on October 28, 1997 that it was revising the design for the proposed repairs, and preparing a new BA. FHWA also retracted its April, 1997

request for formal consultation. (AR 556). Based on the on-site meetings, NMFS committed to work with FHWA and USFS to develop a project proposal that was not likely to adversely affect listed salmon or steelhead. (AR 808–809).

In a letter dated November 25, 1997, the Oregon Department of Fish and Wildlife (ODF & W) stated that they agreed "on project guidelines and modified turbidity criteria for the Gumboot Road Reconstruction Project which protect fish resources ...." (AR 807).[9] In a letter dated December 3, 1997, Bradley J. Smith, District Fish Biologist for ODF & W, stated that despite the improved project design, substantial watershed and fish habitat concerns remained in the form of potential for construction related sediment impacts, substantial risk of future flow events, soil movement, and related in stream sedimentation problems. (Berger Dec. Ex. 29). Mr. Rhodes opines that the modified reconstruction and replacement project still poses a significant risk of serious and irreparable harm to threatened steelhead and chinook and their habitat as a result of increased sedimentation and channel disturbance during construction, increased production and channeling of sediment by the road system, increased risk of land slides, impacts on peak flows and low flows, impacts on stream temperature and turbidity, habitat simplification due to constraint of the stream channel, elimination of sources of large woody debris, and other impacts. (Rhodes Dec. ¶¶ 6–34).

USFS fish biologists prepared a BA of the revised proposal based on changes made to the project. (AR 701)[10]. The BA included

---

**7.** Plaintiffs deny the suggestion that the agencies tried or in fact did avoid any adverse effects on salmon and steelhead. The evidence in the record supports defendants' statement.

**8.** Plaintiffs object to (17) of defendants' concise statement of facts in which defendants assert that the FR 39 project will only restore the road, and it will not widen or otherwise change the character or use of the existing two-lane paved road, citing AR 577–608(pictures which are not supportive of this contention), 710–755 (maps and diagrams which may or may not support this contention), 861–863 (CE for FR 39 repairs which states that no change in the use of the

road is anticipated). This statement is not supported by the evidence cited in the record.

**9.** Plaintiffs object to the first sentence of (15) of defendants' concise statement of facts. The sentence is changed to conform with the record.

**10.** Defendants object to the portion of plaintiffs' concise statement of facts which states that "the project would be likely to adversely affect ..." Plaintiffs cite to the March 31, 1997 draft of the BA. (Berger Dec. Ex. 2). Defendants rely on the December 9, 1997 version of the BA in which found that the project "is not likely to adversely affect ...". The earlier version was included, but

the plat and drawings for the proposed repairs, a photo log of the repair sites, post construction mitigation measures, and a turbidity monitoring plan. (AR 678–805). The BA concluded that:

> The Gumboot Creek Flood Repair Project may affect, not likely adversely affect spring/summer Chinook salmon, steelhead, or bull trout, or result in the adverse modification or destruction of designated critical habitat. This determination is arrived at because the project would either maintain or restore the environmental baseline of the pathways or indicators of Gumboot Creek, and will not pose an increase risk of adverse cumulative affects on populations within designated critical habitat. (AR 705).

The BA found that:

> The Gumboot Creek Road Flood Repair Project will have little effect on increasing turbidity due to the low flow work window, the small amount of instream work to be done, and mitigating measures described in Chapter V. Any increase in fines will be short term. The long term effects, both from adding [large woody materials] through the restoration and road stabilization during construction will be to improve the ability of Gumboot Creek to process sediment. (AR 696).

The Oregon Division of State Lands (DSL) notified FHWA on December 15, 1997, that the Fill/Removal Permit, as modified by ODF & W's recommendations, covered the proposed project as revised. The Army Corps of Engineers (Corps) notified FHWA, on December 24, 1997, that the proposed project as revised continued to be authorized under Nationwide Permit Number 3.[11] (AR 806–807, 812–813).

FHWA sent the BA to NMFS and United States Fish and Wildlife Service (FWS) with a request that they concur in its findings and determination. Pursuant to informal consultation, NMFS found that the BA "fully explained the potential impacts to ESA proposed and listed fishes under NMFS review".[12] (AR 854). They determined that the proposed FR 39 flood repair project would have no more than a negligible potential to adversely affect chinook salmon or their designated critical habitat. NMFS concurred with FHWA's finding that the FR 39 project is not likely to adversely affect chinook salmon, their designated habitat, or steelhead. (AR 676–677, 808–809, 854–855). NMFS, FWS, Corps, and FHWA all found that the proposed project would not have an adverse affect on chinook salmon, steelhead, or their habitat.[13] (AR 174, 670–671, 676–677, 701, 852–855, 857–860, 861–869).

FHWA's and USFS's biologists discussed the revised proposal with the WWNF Level 1 Team (Level 1 Team), composed of Forest Service and NMFS fishery experts, at a December 4, 1997 meeting.[14] (AR 659–661). The Level 1 Team provided preliminary agreement with the agencies preliminary affects determination. They found that the project was consistent with the PACFISH and WWNF Land and Resource Manage-

---

it was noted that the later version was based on changes to the project. Plaintiffs object to defendants' characterization that the BA is a thorough and complete study and evaluation of the effect of the proposed FR 39 flood repair project on chinook salmon and steelhead. Defendants cite AR 678–805 which is the study. This statement was excluded because it is the defendants' opinion of the BA, rather than a fact.

**11.** Plaintiffs object to (16) of defendants' concise statement of facts arguing that it is a legal conclusion. Plaintiffs are correct and this statement is excluded.

**12.** Plaintiffs object to the second, third, and fourth sentences of defendants' fact (13). The second sentence is a quote from the NMFS letter. The third sentence is omitted because it was not in the letter. The fourth sentence is supported by the letter.

**13.** Defendants object to the portion of plaintiffs' concise statement of facts which contain opinions that the proposed project poses a significant risk of serious harm. Defendants cite to various agencies that they represent have found that the proposed project would not have an adverse impact. The court has included the agencies for which there is support in the record. Much of the evidence cited defendants does not directly support this contention.

**14.** Plaintiffs object to the last three sentences of defendants' (10), arguing that there is insufficient evidence in the record of the proceedings to permit any findings as to their proceedings, deliberations, or conclusions. The court examined the evidence cited by defendants and modified this section accordingly.

ment Plan (LRMP) Directions. (AR 854–855).

On January 16, 1998, NMFS issued a letter which stated that the proposed FR 39 flood repair project would have no more than a negligible potential to adversely affect chinook salmon or their designated critical habitat. The NMFS' letter concurred in FHWA's finding that the FR 39 project is "not likely to adversely affect chinook salmon, their designated habitat, or steelhead." (AR 854–855).

FWS completed conferencing with FHWA on January 28, 1998. They determined that the action included measures that would prevent sedimentation of the Gumboot Creek and the Imnaha River.[15] They concurred in FHWA's determination that the proposed repairs were not likely to adversely affect bull trout. (AR 859–860).

Mr. Rhodes opines that sediment delivery from the reconstruction of FR 39 will impede the development of increased pool frequency in Gumboot Creek and has the potential to reduce pool frequency over time which is contrary to the PACFISH regulations and the USFS's interim strategy for managing anadromous salmonid habitat. (Rhodes Dec. ¶ 11)[16]. He opines that increased sedimentation caused by the reconstruction of FR 39 may affect compliance with the fine sediment standard set in the WWNF LRMP. He opines that the elevated levels of sediment

delivery caused by the reconstruction is likely to reduce salmonid survival and may affect compliance with the LRMP. (Rhodes Dec. ¶ 12).

Mr. Rhodes opines that increased turbidity caused by the reconstruction may contribute to turbidity increases that exceed Oregon state standards. (Rhodes Dec. ¶ 13). He also opines that increased sediment delivery will impede or prevent recovery in width/depth ratios, which in turn can increase summer water temperatures and decrease winter temperatures. Gumboot Creek already exceeds the PACFISH RMO for width/depth ratio and the Oregon state standard for water temperature. (Rhodes Dec. ¶ 14).

USFS determined that the work on FR 39 is consistent with the WWNF LRMP and the PACFISH Standards and Guidelines. (AR 88, 691).[17] USFS has also determined that proposed project is consistent with the HCNRA Comprehensive Management Plan.[18] (AR 690–694). Corps verified that the then proposed repair work was authorized to proceed under the Corps's Nationwide Permit No. 3 on May 8, 1997. DSL issued a removal/fill permit for the then proposed repair work on May 20, 1997. (AR 223–236).[19] The Oregon Department of Environment Quality (DEQ) has pre-certified that work covered by a Nationwide Permit No. 3 comply with applicable provisions of the Clean Water Act. (AR 350).[20] None of

15. Plaintiffs claim that it is erroneous to suggest that sedimentation would be prevented. The letter specifically states that: "The action includes measures that would prevent sedimentation of Gumboot Creek (Page 24). These measures will avoid sedimentation of the Imnaha River where bull trout are documented presence." (AR 859).

16. Defendants object to the portion of plaintiffs' concise statement of facts which states that the project is potentially inconsistent with applicable Oregon state water quality standards, Forest Service standards for management of anadromous fish habitat on national forest lands, and the draft revised comprehensive management plan for HCNRA. This statement is based in part on opinions contained in Mr. Rhodes' declaration. The court deleted this statement and included the specific statements contained in Mr. Rhodes' declaration. Statements based on the March 31 BA are no longer relevant because that document has been superseded by the December 9 BA. The other document cited by plaintiffs, Berger Dec. Ex. 1, does not support these factual contentions.

17. In objecting to plaintiffs' concise statement of facts, defendants offer the facts contained in (8). The facts which are supported by the record are included.

18. Plaintiffs object to (22) of defendants' concise statement of facts which states that: "The FR 39 project is not inconsistent with any Federal or State laws." Plaintiffs argue that this is a legal conclusion. This is a legal conclusion, and therefore, it is omitted.

19. Plaintiffs object to (18) of defendants' concise statement of material facts. The court included what each particular agency found and the opinion of Mr. Rhodes.

20. Plaintiffs object to the defendants' contention that the DEQ certified that the work covered by the Nationwide Permit No. 3 would comply with all applicable provisions of the CWA, including Oregon's water quality standards. The court examined the evidence cited by defendants to support this statement and rephrased it to more accurately reflect what the evidence shows.

the responsible federal or state fisheries or water quality agencies were opposed to the proposed repair and restoration project. (AR 163–179, 233–236, 261–262, 332, 335–336, 339–345, 375–376, 388–389, 390, 460, 480–481, 485, 639–640, 659, 661–671, 676–805, 806–809, 812–815, 853–855, 857–860).

FHWA issued a documented CE for the proposed work on FR 39 on February 5, 1998. Based on the referenced documentation, the CE found that the action: 1) constituted modernization of a road by resurfacing, restoration, rehabilitation, or reconstruction, within the meaning of 23 C.F.R. §§ 771.117(d)(1), (2)[21]; 2) met the conditions or criteria for CEs in the CEQ (40 C.F.R. § 1508.4) and FHWA (23 C.F.R. § 771.117(a) regulations; 3) would not have significant effect on the environment; and 4) presented no unusual circumstances as listed in 23 C.F.R. § 771.117(b) that would make the CE classification improper. FHWA determined that a Class II CE was the appropriate environmental classification, and that an EA or EIS was not required. (AR 861–869).[22] In completing the CE checklist, FHWA determined that a wild and scenic rivers consistency determination was provided by USFS, and that the proposed repairs would move segments of the road out of the floodplain/riparian areas and post-construction mitigation work would accelerate recovery and development of the riparian area.[23]

Hells Canyon Preservation Council (HCPC) proposed the consideration of an alternative to the reconstruction of FR 39 called the "Coverdale Option". (Berger Dec. Ex. 12). A concept paper developed by HCPC suggests that the "Coverdale Option" may be a better alternative to rebuilding FR 39. (Berger Dec. Ex. 12). The concept paper suggests that exercising this option may result in: 1) quicker opening of the road; 2) possible cost savings; 3) relocation of the road to an area that won't washout; 4) provide a more attractive route through with better scenery and with improved recreational access opportunities; 5) elimination of an identified hazard along Gumboot Creek; 6) better protection for fish and wildlife; and 7) removal of conflicts with the ESA. (Id.). The Columbia River Intertribal Fish Commission (CRITFC), ODF & W, several conservation groups, and several members of Oregon's Congressional delegation wrote letters expressing concerns over the reconstruction of FR 39, and requested further environmental documentation and consideration of alternatives, including the "Coverdale Option". (Berger Dec. Ex. 11, 19–34).[24] Mr. Rhodes

21. Plaintiffs object to (19) of defendants' concise statement of facts which states that: "The work constitutes restoration, rehabilitation, or reconstruction of an existing highway." Plaintiffs argue that this is a legal conclusion. This appears to be a legal conclusion.

22. Defendants object to the portion of plaintiffs' concise statement of facts which states that "The FHWA has refused to prepare an environmental assessment or environmental impact statement for the project...." Plaintiffs' statement is argumentative. Therefore it is excluded. The court included the statement by the defendants which states only the facts rather than a characterization of those facts.

23. Plaintiffs object to (20) of defendants' concise statement of facts. Defendants cite AR 710, 712, and 857 which are not supportive of the statement contained in (20). The court substituted the statements contain in AR 867. The letter from Bradley Smith has been included in the facts. Specific portions of Mr. Rhodes declaration are also included. Plaintiffs make a general reference to both the first and second declaration, but fail to cite any specific paragraphs which they are required to do under the Local Rules. The court did not search both declarations to determine whether there were any facts to support these statements.

24. Defendants object to plaintiffs' characterization of the project as highly controversial on environmental grounds. They have objected to the accuracy of some of the representations made including the number of conservation groups objecting to the project, and the representations that numerous organizations and individuals have supported consideration of an alternative to the reconstruction of FR 39. The characterizations are eliminated, and the facts changed to more accurately represent the evidence presented. Plaintiffs object to (21) of defendants' concise statement of facts which states that: "There is no substantial controversy on environmental grounds with respect to the FR 39 project," citing AR 287–290, 861–869. Plaintiffs cite contrary evidence contained in the record which allegedly demonstrate that there is controversy, AR 261–262, 332, 335–336, 339–345, 388–390, 460, 480–481, 485, 520, 660, 809. In addition, plaintiffs cite to the declaration of Bradley Smith, Joh Rhodes, and Patti Goldman. The defendants' statement is not supported by the record.

opines that the Coverdale route may result in less significant impacts on water quality and salmonid habitat than reconstruction of FR 39. (Rhodes Dec. ¶ 11).

USFS has determined that the "Coverdale Option" does not meet the purpose and need for FR 39, would cost several times the estimated cost to repair the Gumboot Creek section, would take several years longer to complete, and would have significant environmental impacts. (AR 261–262, 333–334, 361–365, 461–469, 472–479, 487, 557–559). USFS has determined that the grade of road 3925 is too steep to safely accommodate traditional public use of the Loop road and permanent relocation would require new construction at a safer grade. Construction would cost several million dollars more than repairing the Gumboot section of the Loop road. Construction of a new road would require lengthy environment analysis. Construction would also cause major environment impacts. (AR 33, 362, 461). FHWA and USFS have not assessed the Coverdale route or any other alternative to the proposed project in any public NEPA document.

## II. *LEGAL STANDARDS*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). The moving party bears the initial burden of proof. *See Rebel Oil Company, Inc. v. Atlantic Richfield Company*, 51 F.3d 1421, 1435 (9th Cir.), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). The moving party meets this burden by identifying portions of the record on file which demonstrate the absence of any genuine issue of material fact. *Id.*

In assessing whether a party has met their burden, the court must view the evidence in the light most favorable to the nonmoving party. *Allen v. City of Los Angeles*, 66 F.3d 1052 (9th Cir.1995). All reasonable inferences are drawn in favor of the nonmovant. *Id.* If the moving party meets their burden,

the burden shifts to the opposing party to present specific facts which show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Auvil v. CBS "60 Minutes"*, 67 F.3d 816 (9th Cir.1995), *cert. denied*, 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996). The nonmoving party cannot carry their burden by relying solely on the facts alleged in their pleadings. *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir.1993). Instead, their response, by affidavits or as otherwise provided in Rule 56, must designate specific facts showing there is a genuine issue for trial. *Id.*

## III. *DISCUSSION*

### Standards for Review of Agency Decision

In their opening brief, plaintiffs contend that the standard of review is arbitrary and capricious. In their notice of recent authority, plaintiffs contend that the standard of review is reasonableness, citing *Northcoast Environmental Center v. Glickman*, 136 F.3d 660 (9th Cir.1998). Defendants argue that this case is distinguishable from *Northcoast*, because it turns entirely on factual disputes between plaintiffs' experts and FHWA's experts on whether the environmental impacts alleged by plaintiff are likely to occur. Defendants argue that this case is more akin to the dispute in *Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir.1992), where the court found that "when a litigant challenges an agency determination on the grounds that, in essence, allege that the agency's expert review ... was incomplete, inconclusive, or inaccurate ... the greater degree of deference expressed by the arbitrary and capricious standard is appropriate." *Id.* at 1331–1332 (internal citation omitted).

In *Northcoast*, USFS and BLM determined that NEPA was inapplicable to their issuance of the Port Orford Cedar Action Plan and Port Orford Cedar Management Guidelines. *Id.* at 665. The court in *Northcoast* explained that the Ninth Circuit has two different standards in the NEPA context. *Id.* at 667. The arbitrary and capricious standard applies when reviewing factual disputes involving agency expertise between an agency and petitioners. *Id.* (internal citation omitted). The resolution of

factual disputes between the agency's scientific conclusions and those of the plaintiff's experts are subject to the arbitrary and capricious standard of review. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1331 (9th Cir. 1992). Decisions involving primarily legal questions are reviewed under the reasonableness standard. *Northcoast*, 136 F.3d at 667. (internal citation omitted). In *Northcoast*, the court addressed the threshold question of NEPA applicability, and found that the reasonableness standard applied to threshold agency decisions that certain activities are not subject to NEPA procedures because such a determination is primarily a legal issue based upon undisputed historical facts. *Id.* at 667.

 This case involves predominantly factual determinations, rather than legal determinations. In this case, plaintiffs are challenging the agency's determination that the project qualifies for a categorical exclusion. This determination was based on the factual determinations of the agency's experts regarding the environmental impacts of the project and other factual determinations made in deciding whether a CE was appropriate. In *Hells Canyon Preservation Council v. U.S. Forest Service*, 883 F.Supp. 534, 537 (D.Or.1995), Judge Jones determined that the decision to invoke a categorical exclusion is reviewed under the "arbitrary and capricious standard". The court finds that the appropriate standard of review is arbitrary and capricious.

**NEPA Regulations**

 NEPA requires federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "An agency must prepare an EIS if substantial questions are raised as to whether a project . . . may cause a significant degrada-

tion of some human environmental factor. The plaintiff need not show that significant effects will in fact occur, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared." *Greenpeace Action*, 14 F.3d at 1332 (internal citations and quotations omitted). NEPA also requires consideration of indirect effects [25] "which are caused by the action and are later in time or farther (sic) removed from the action, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

The Council on Environmental Quality (CEQ) promulgated regulations governing the agency's obligations and responsibilities in applying NEPA. *See* 40 C.F.R. §§ 1500–1508. The regulations describe three categories of agency action and specify the kind of agency review required for each. The categories are: (1) actions that may significantly affect the environment and thus generally require a full environmental impact statement (EIS), 40 C.F.R. § 1501.4(a)(1); (2) actions that may or may not have a significant environmental impact and thus ordinarily require only a more limited environmental assessment (EA) to determine whether an EIS is necessary, 40 C.F.R. § 1501.4(c); and (3) actions that typically do not have a significant effect on the human environment and thus qualify for a "categorical exclusion" from the requirements for the preparation of an EA or an EIS, 40 C.F.R. §§ 1500.4(p), 1501.4(a)(2) and 1508.4. The agency determines the category covering its proposed action. *Cross–Sound Ferry Services, Inc. v. U.S.*, 573 F.2d 725, 731 (2d Cir.1978).

The regulations require agencies to adopt procedures that include "specific criteria for identification of classes of actions that normally do not require either an [EIS] or an [EA] (categorical exclusions (§ 1508.4)." 40

---

**25.** 40 C.F.R. § 1508.8(b) provides:
"Indirect effects, which are caused by the action and are later in time or farther (sic) removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems. Effects and impacts as used in these regulations are synonymous. Effects includes ecological

(such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial."

C.F.R. § 1507.3. The CEQ regulation defines "categorical exclusion" (CE) as follows:

> "Categorical exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations ... and for which, therefore, neither an [EA] nor an [EIS] is required.... Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.

**FHWA Regulations**

The Federal Highway Administration regulations define three classes of actions, and depending on the class, they define the level of NEPA documentation required. 23 C.F.R. § 771.115. Class II, which are CEs,[26]

are defined under 23 C.F.R. § 771.115(b) which provides that: "Actions that do not individually or cumulative[ly] have a significant effect are excluded from the requirements to prepare an EA or EIS. A specific list of CEs normally not requiring NEPA documentation is set forth in 771.117(c).[27] When appropriately documented, additional projects may also qualify as CES pursuant to 771.117(d)."

23 C.F.R. § 117.117(b) provides that: "Any action which normally would be classified as a CE but could involve unusual circumstances will require the Administration, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper. Such unusual circumstances include: (1) Significant environmental impacts; (2) Substantial controversy on environmental grounds; (3) Significant impact on properties protected by section 4(f) of the DOT Actor section 106 of

26. 23 C.F.R. § 771.117(a) defines CEs as "actions which meet the definition contained in 40 C.F.R. § 1508.4, and, based on past experience with similar actions, do not involve significant environmental impacts. They are actions which: do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts."

27. 23 C.F.R.. § 771.117(c) provides that: "The following actions meet the criteria for CEs in the CEQ regulation (section 1508.4) and § 771.117(a) of this regulation and normally do not require any further NEPA approvals by the Administration: (1) Activities which do not involve or lead directly to construction, such as planning and technical studies; grants for training and research programs; research activities as defined in 23 U.S.C. § 307; approval of a unified work program and any findings required in the planning process pursuant to 23 U.S.C. § 134; approval of statewide programs under 23 C.F.R. *Part* § 630; approval of project concepts under 23 C.F.R. *Part* 476; engineering to define the elements of a proposed action or alternatives so that social, economic, and environmental effects can be assessed; and Federal-aid system revisions which establish classes of highways on the Federal-aid highway system; (2) Approval of utility installations along or across a transporta-

tion facility; (3) Construction of bicycle and pedestrian lanes, paths, and facilities; (4) Activities included in the State's "highway safety plan" under 23 U.S.C. § 402; (5) Transfer of Federal lands pursuant to 23 U.S.C. § 317 when the subsequent action is not an FHWA action; (6) The installation of noise barriers or alterations to existing publicly owned buildings to provide for noise reduction; (7) Landscaping; (8) Installation of fencing, signs, pavement markings, small passenger shelters, traffic signals, and railroad warning devices where no substantial land acquisition or traffic disruption will occur; (9) Emergency repairs under 23 U.S.C. § 125; (10) Acquisition of scenic easements; (11) Determination of payback under 23 C.F.R. *Part* 480 for property previously acquired with Federal-aid participation; (12) Improvements to existing rest areas and truck weigh stations; (13) Ridesharing activities; (14) Bus and rail car rehabilitation; (15) Alterations to facilities or vehicles in order to make them accessible for elderly and handicapped persons; (16) Program administration, technical assistance activities, and operating assistance to transit authorities to continue existing service or increase service to meet routine changes in demand; (17) The purchase of vehicles by the applicant where the use of these vehicles can be accommodated by existing facilities or by new facilities which themselves are within a CE; (18) Track and railbed maintenance and improvements when carried out within the existing right-of-way; (19) Purchase and installation of operating or maintenance equipment to be located within the transit facility and with no significant impacts off the site; (20) Promulgation of rules, regulations, and directives."

the National Historic Preservation Act; or (4) Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action."

23 C.F.R. § 771.117(d) provides that: "Additional actions which meet the criteria for a CE in the CEQ regulations (40 C.F.R. § 1508.4) and paragraph (a) of this section may be designated as CEs only after Administration approval. The applicant shall submit documentation which demonstrates that the specific conditions or criteria for these CEs are satisfied and that significant environmental effects will not result. Examples of such actions include but are not limited to: (1) Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g., parking, weaving, turning, climbing) . . . ."

Plaintiffs make the following arguments in support of their motion for summary judgment: 1) the agency's decision to designate the project as a CE under the documented CE exception is arbitrary and capricious because the agency cannot identify the specific category of actions which the project fits and because agency reliance on additional environmental studies to make the CE determination violates the letter and the intent of the CE rule;

2) the agency's decision to designate the project as a CE is unreasonable because of: the likelihood of significant environmental impacts on threatened chinook salmon and steelhead, and the presence of other unusual circumstances such as: a) the substantial controversy between the project proponents and other expert agencies regarding those impacts; b) the potential inconsistency of the project with the ESA, state and federal water quality laws, and other legal requirements; c) the existence of reasonable, unexamined alternatives that would reduce the threatened impacts; d) if the USFS is the applicant for the road repair funds, its regulations should control, and, under USFS NEPA guidelines, this project would not qualify for a CE because of the presence of extraordinary circumstances;

3) the agency should prepare an EIS because the plaintiffs have clearly demonstrated that the project may have a significant impact on the environment and at least one reasonable alternative worthy of study exists; and

4) plaintiffs are entitled to a permanent injunction because they have shown: a) success on the merit; b) irreparable harm to threatened chinook and steelhead and their habitat if the project goes forward; c) the equities balance in their favor; d) the public interest favors the issuance of an injunction; and e) any harm to defendants is negligible.

Defendants move for summary judgment and oppose plaintiffs' motion for summary judgment and permanent injunction based on the following arguments:

1) FHWA's CE regulations, which allow for a documented CE, are legally proper;

2) the repair and restoration of FR 39 falls under 23 C.F.R. § 771.117(d)(1) because: a) the project will simply repair the damage done to FR 39 by the New Years Day Floods; b) this determination is supported by the description of the nature of the proposed work; c) this determination is consistent with the ordinary meaning of the terms restoration, rehabilitation, and reconstruction; and d) the court should defer to the agency's interpretation of its own regulation;

3) FHWA's determination that the repair and restoration of FR 39 will not significantly affect the environment, including threatened chinook salmon and steelhead, was not arbitrary and capricious;

4) FHWA properly determined that there are no unusual circumstances which preclude the application of a CE;

5) an EIS is not required for the FR 39 project; and

6) it is not in the public interest to enjoin the FR 39 project.

In their reply, plaintiffs make the following additional arguments:

1) FHWA's documented CE regulation only applies to FHWA-funded projects in which a non-federal applicant demonstrates to FHWA that no significant environmental impacts will result;

2) the project does not fit within the highway modernization CE because: a) the project does not qualify as an emergency road re-

pair; b) FR 39 is not a highway under 23 U.S.C. § 101; c) the project is not a highway modernization project; and d) the project relocates portions of the road to lessen environmental impacts;

3) the ESA does not supplant the NEPA process;[28]

4) FHWA improperly relied on mitigation of questionable effectiveness to reach a finding of no significant impacts;

5) the documentation pertaining to modified project fails to address many still relevant impacts identified in the original BA and draft biological opinion; and

6) the December BA's NLAA conclusion is inconsistent with the information in the BA.

In their reply, defendants make the following additional arguments:

1) FHWA's documented CE regulation applies to ERFO projects administered by FHWA;

2) FHWA's CE determination is not based on USFS regulations;

3) FR 39 is a highway within the meaning of 23 U.S.C. § 201;

4) the existence of FR 39 does not give rise to any requirements under NEPA;

5) FHWA properly relied on expert opinions from NMFS and the USFS that the FR 39 project would produce no significant environmental impacts;

6) FHWA's determination that the mitigation measures in the FR 39 project will prevent any significant environmental impacts was not arbitrary and capricious; and

7) the documentation pertaining to the modified project addresses relevant potential impacts identified in the March BA and the Draft BO.

**Validity of FHWA's Documented CE Regulation**

Plaintiffs argue that FHWA erred by designating the FR 39 project as a CE under 23 C.F.R. § 771.117(d) because: 1) the reliance on an additional study to determine the applicability of a CE, as allowed under FHWA's documented CE regulation, violates that letter and intent of the CE rule; 2) the CEQ regulations require agencies to promulgate rules delineating certain types of actions that qualify for a CE, rather than allowing an agency to make a case-by-case study of whether a particular action may have a significant environmental impact; and 3) in cases where additional study is necessary, an EA is appropriate. Plaintiffs also argue that FHWA's decision to designate the FR 39 project as a CE was arbitrary and capricious and violates NEPA, because FHWA had to rely on an additional environmental study to determine the impacts of the project, citing *State of Mississippi, ex rel. Moore v. Marsh,* 710 F.Supp. 1488, 1507 (S.D.Miss.1989). Plaintiffs claim they are not challenging the facial validity of 23 C.F.R. § 771.117(d), but only the lawfulness of its application to the FR 39 project.

Defendants argue that if plaintiffs are challenging FHWA's ability to make a documented CE, as expressly authorized by the regulation, such a challenge is barred by 28 U.S.C. § 2041(a), which precludes challenges brought more than six years after the regulations are issued. Defendants also argue that, if the court were to address this challenge on the merits, CEQ has approved 23 C.F.R. § 771.117(d), and courts have uniformly upheld the validity of FHWA's CE regulations, including § 771.117(d).

Section 771.117(d) provides, in part, that: "Additional actions which meet the criteria for a CE in the CEQ regulations (40 C.F.R. § 1508.4) and paragraph (a) of this section may be designated as CEs only after Administration approval. The applicant shall submit documentation which demonstrates that the specific conditions or criteria for these CEs are satisfied and that significant environmental effects will not result...." Section 771.117(d) authorizes FHWA to consider additional documentation which demonstrates that significant environmental results will not result. Any attempt by plaintiffs to challenge the validity of this regulation or the ability of FHWA to consider additional docu-

---

**28.** In defendants' reply, they respond that they have not made this argument. Instead, defendants claim that the FHWA availed itself of the expertise of other agency biologists, and that they can employ these findings in order to determine whether the project has any potential impacts that would make it ineligible for a CE.

mentation in determining the applicability of a CE designation and, still apply a CE, is barred by the statute of limitations. 28 U.S.C. § 2401(a). *See Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1456 fn. 5 (9th Cir.1996).

■ The court also finds that FHWA's reliance on additional environmental study to determine the impacts of the project, by itself, does not render FHWA's CE determination arbitrary and capricious. *Cf. Public Interest Research Group of New Jersey, Inc. v. Federal Highway Admin.,* 884 F.Supp. 876, 886 (D.N.J.1995). Such consideration is contemplated by the regulation. The court finds *State of Mississippi, supra* inapplicable.

### Applicability of 23 C.F.R. § 771.117(d)

Defendants argue that the repair and restoration of FR 39 comes under 23 C.F.R. § 771.117(d) because: 1) the project will repair the damage done by the 1997 New Years Eve Floods; and 2) the project will not widen or otherwise change the character or use of the road (AR 577–608, 710–755, 861–863). Defendants argue that FHWA's determination that the project falls within the exception for modernization of a road is supported by the description of the project, and is consistent with the ordinary meaning of the terms restoration, rehabilitation, and reconstruction. Defendants also argue that the FHWA's determination is reasonable and the court should defer to the agency's interpretation of the regulation.

In response, plaintiffs argue that: 1) the FHWA's documented CE regulation only applies to FHWA-funded projects in which a non-federal applicant demonstrates to FHWA that no significant environmental impacts will result; 2) in all the cases relied upon by defendants a state highway department sought and obtained FHWA funding for a state highway improvement project, but, in this case, because there is no state applicant, FHWA cannot apply § 771.117(d); 3) under the regulations, FHWA serves as a neutral arbitrator of the applicant's request for a CE, which is not the circumstances in this case, and, therefore, FHWA cannot apply; 4) if the USFS is considered

the applicant in this case, then their NEPA regulations should control, and under USFS regulations, a CE would not be allowed because of the presence of extraordinary circumstances [29]; 5) the FR 39 project does not fit within the highway modernization CE because FR 39 is not a highway; and 6) the FR 39 project is not a highway modernization project because of the key question regarding whether the environmental effects from the existence of the road in its current location are too severe to allow it to remain where it is, and because the FR 39 project does not merely return the road back to its former condition, but relocates portions of the road to lessen its adverse environmental impacts.

In their reply, defendants make the following arguments: 1) FHWA's documented CE regulation applies to the FR 39 project— FHWA promulgated one set of regulations that apply to both the Federal-aid Highway Program and the Federal Lands Highway Program, these regulations apply to both programs, and FHWA has consistently interpreted 23 C.F.R. Part 771 to apply to all actions where FHWA is the lead agency; 2) defendants are not claiming that the FR 39 project has been CE on the basis of the USFS regulations—FHWA as the lead agency based its determination on FHWA's CE regulations and these regulations control; 3) FR 39 is a highway within the meaning of 23 U.S.C. § 101; 4) the FR 39 project constitutes restoration, rehabilitation, and reconstruction of a highway within the meaning of 23 C.F.R. § 771.117(d)(1)—the court should defer to the agency's interpretation of the regulation; 5) plaintiffs offer no authority to support their argument that modernizing a highway is limited to major thoroughfares and the cases cited by plaintiffs are to the contrary—reconstruction in those cases did not occur; 6) plaintiffs cite no authority for their argument that the use of a new right of way and realignment of the roadway makes the modernization exclusion inapplicable; 7) plaintiffs' argument regarding the environmental impacts of the existence of the road do not address this issue, but are properly addressed in the context of whether the pro-

29. In their reply, defendants do not contend that the USFS is the applicant.

ject will have significant environmental impacts; and 8) the existence of FR 39 does not give rise to any requirements under NEPA—FR 39 is a permanent road, an EIS is not required for an agency's continued management of an existing facility, and relocation of portions of the road is not equivalent to building a new road.

▮▮▮▮ "[A]n agency's construction of it's own regulations is entitled to substantial deference." *Martin v. Occupational Safety and Health Review Commission,* 499 U.S. 144, 150, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)(internal citation and quotations omitted). The court should give deference to the agency's interpretation of their regulations if their interpretation is reasonable. *Id.* An interpretation is reasonable if it "sensibly conforms to the purpose and wording of the regulations." *Id.* at 151, 111 S.Ct. 1171. The agency's ·interpretation is controlling "unless it is plainly erroneous or inconsistent with the regulations." *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)(internal citation omitted).

Section 771.117(d) provides for a CE for the "modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes ...," when an applicant submits documentation which demonstrates that the specific conditions or criteria for CEs in the CEQ regulations, 40 C.F.R. § 1508.4, and 23 C.F.R. § 771.117(a) are satisfied and that significant environmental effects will not result. FHWA determined the FR 39 project fell within the example of 23 C.F.R. § 771.117(d)(1) modernization of a road by resurfacing, restoration, rehabilitation, or reconstruction. (AR 863). FHWA made this determination even though the project involved the relocation of the road away from the creek in some areas.

▮▮▮▮ Plaintiffs' argument regarding the environmental impacts created by the mere existence of the FR 39 project is unpersuasive. Any potential environmental impacts from the existence of FR 39 do not disqualify the FR 39 project as modernization of a road under (d). The description of the FR 39 project contained in the administrative record, that the agency's interpretation that the FR 39 project comes within the meaning of

modernization of a road by resurfacing, restoration, rehabilitation, or reconstruction, is not unreasonable. Based on the description of the project in the· administrative record, the agency's determination is consistent with the plain meaning of the terms resurfacing, restoration, rehabilitation, and reconstruction. (AR 55–68, 577–608, 678–805, 861–865).

Section 101 defines the term "forest development road" as "a forest road ... under the jurisdiction of the Forest Service." Cite 23 U.S.C. § 101 provides that: "The term highway includes roads, streets, parkways ...." It is clear that FR 39 is a highway as the term is defined under 23 U.S.C. § 101.

FHWA administers two highway programs, Federal-aid Highway Program, 23 U.S.C. Chapter 1, and the Federal Lands Highway Program, 23 U.S.C. Chapter 2. FHWA has issued one set of regulations for implementing NEPA requirements for both programs. 23 C.F.R. §§ 771.101, 107(b), (d), 109(a)(1). 23 C.F.R. Part 771 applies to both programs. *See* 23 C.F.R. § 771.101. Section 771.107(b) defines "action" to include a highway project proposed for FHWA funding. 23 C.F.R. § 771.107(b). Section 771.109 provides that: "The provision of this regulation and the CEQ regulation apply to actions where the Administration exercises sufficient control to condition the permit or project approval." 23 C.F.R. § 771.109.

▮▮▮ When the regulations are read as a whole, 23 C.F.R. § 771.117(d) applies to the FR 39 project, even if it is not a FHWA-funded project with a non-federal applicant. In addition, FHWA has submitted evidence which demonstrates that it has consistently applied this regulation to all actions in which FHWA is the lead agency. (Defendants' Ex. 101; Heanue Dec.; Burden Dec.). The FHWA has interpreted the regulations as applicable to this project and has consistently applied this regulation to these type of projects. The court will defer to FHWA's interpretation because it is reasonable, and is not plainly erroneous or inconsistent with the regulation.

## Likelihood of Significant Environmental Impacts

Plaintiffs argue that FHWA's decision to use a CE on the FR 39 project is unreason-

able because the project is likely to have significant environmental impacts, and, as such, a CE designation is precluded under 23 C.F.R. § 771.117(b). Plaintiffs contend that the inapplicability of a CE is established by the likely significant impacts on threatened chinook salmon and steelhead. Plaintiffs cite the following evidence in support of their contention: FHWA and USFS admit that the FR 39 project may affect threatened salmon and steelhead; ODF & W have stated that the project will have significant impacts on the threatened fish and their habitat (Berger Dec. Ex. 29); Jon Rhodes, plaintiffs' expert, also opines that the project will have adverse impacts (Rhodes Dec. ¶¶ 6–24); and former USFS officers opine that the project is likely to have significant impacts to threatened salmon and steelhead and their habitat (Boe Dec. ¶¶ 8–12; Bishop Dec. ¶¶ 4, 6). Plaintiffs also contend that the proximity of the project to wetlands, wild and scenic rivers, and ecologically critical areas, and the fact that the Imnaha River, a designated wild and scenic river, will experience sediment and turbidity impacts from the project preclude a finding of a CE.

Defendants argue that the FHWA's determination that the FR 39 project would not significantly affect the environment, including threatened spring/summer chinook salmon and steelhead or their habitat, was not arbitrary and capricious. Defendant argues that the administrative record demonstrates that: FHWA took a hard look at the impact of the proposed project on chinook salmon and steelhead; consulted with NMFS; made a reasoned determination that the project would not have a significant effect on salmon and steelhead; and provided a reasoned explanation of its decision (AR 163–179, 233–236, 639–640, 659, 661–671, 676–805–809, 812–815, 853–855, 857–869). Defendants also argue that FHWA validly relied on agency experts when making its determination, and the court must defer to that exercise of agency discretion.

In reply, plaintiffs argue that: FHWA's conclusion that the FR 39 project will not have significant environmental impacts was arbitrary and capricious; the presence of threatened species, steep slopes, and flood plains preclude the use of a CE; FHWA improperly relied on mitigation of questiona-

ble effectiveness to reach its finding of no significant impact (Rhodes Dec. ¶ 10; Boe Dec. ¶ 11); and the documentation pertaining to the modified project fails to address many relevant impacts identified in the original biological assessment and draft biological opinion (Rhodes Dec. ¶ 9; Second Rhodes Dec. ¶¶ 4 and 6).

In reply, defendants argue that plaintiffs' argument that the mere presence of threatened species, steep slopes, and floodplains is incorrect for the following reasons: this argument was rejected in *Southwest Ctr. For Biological Diversity*, 100 F.3d at 1450; USFS regulations on CE only apply to USFS actions, not FHWA actions; neither CEQ or FHWA regulations consider the mere presence of threatened species, steep slopes, or floodplains to preclude a finding of a CE; FHWA's determination that the mitigation measures in the FR 39 project will prevent any significant environmental impacts was not arbitrary and capricious; and the documentation pertaining to the modified project addresses relevant potential impacts identified in the March BA and Draft BO.

■■■ The arbitrary and capricious standard requires the court to ensure that an agency has taken the requisite "hard look" at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is "founded on a reasoned evaluation 'of the relevant factors'" and whether there has been clear error in judgment. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)(quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). "An agency's decision may only be called arbitrary and capricious if: the agency has relied on factors which Congress has not intended to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Southwest Ctr. For Biological Diversity v. U.S. Forest Service*, 100 F.3d

1443, 1448 (9th Cir.1996)(internal citation omitted).

The court's inquiry into the facts should be searching and careful. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992)(internal citation omitted). "But, when specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* (internal citation and quotations omitted). Even when a plaintiff presents expert opinions raising questions regarding an agency's analyses, methodology, and conclusions, such opinions have been viewed by the courts as "a difference of scientific opinion." *Id.* at 1333. NEPA does not require the court to decide whether an agency's evaluation is based on the best scientific methodology available or to resolve disagreements among various scientist as to methodology. *Id.* (internal citation and quotations omitted). The court is not empowered to decide that the views of the plaintiff's experts have more merit than the agency's experts. *Id.* If the court is satisfied that an agency's "exercise of discretion is truly informed, the court must defer to 'th[at] informed discretion.'" *Id.* at 377, 109 S.Ct. 1851. (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

FHWA issued a documented Categorical Exclusion (CE) for the proposed work on FR 39. The CE found that the action would not have a significant effect on the environment. (AR 861–869). The CE stated that FHWA consulted with NMFS to address the potential impacts to steelhead and salmon. The CE also discusses the BA. The BA prepared for the project identifies specific restrictions, mitigation, and turbidity monitoring requirements, and includes details of the post-construction mitigation effort. The BA concluded that "the proposed action would not hinder the attainment of relevant properly functioning indicators (water quality, habitat access, habitat elements, channel condition, flow/hydrology, and watershed conditions) and that there is a negligible probability of take of spring/summer chinook salmon, or steelhead trout, or of destruction/adverse modification of habitat." Based on the BA, the FHWA determined that the project "is not likely to adversely affect the spring/summer chinook salmon or steelhead trout." The CE states that NMFS and FWS both concurred with this determination. (AR 862).

Bradley J. Smith, District Fish Biologist for ODF & W stated that despite the improved project design, substantial watershed and fish habitat concerns remained in the form of potential for construction related sediment impacts, substantial risk of future flow events, soil movement, and related instream sedimentation problems. (Berger Dec. Ex. 29). Mr. Rhodes, plaintiffs' expert, opines that the project will have several negative effects on water quality and salmonid habitat including: elevated erosion and sedimentation, increased rates of mass failure including landslides, mitigation measures called for in the BA will not eliminate sediment impacts, increased turbidity, prevention of channel migration, prevention of pool development with overhanging banks, removal of additional vegetation, significant amounts of fill in the floodplain, interception of groundwater, alteration of groundwater and surface flow, and allowing livestock access to the creek. (Rhodes Dec. ¶¶ 6–22).

Mr. Rhodes also opines that: "there is no good evidence that mitigation measures limit impacts caused by major land disturbances, such as road reconstruction, to levels that are biologically insignificant ... road reconstruction will significantly elevate sediment delivery even if mitigation measures are effectively implemented." (Rhodes Dec. ¶ 10). Mr. Boe, a former USFS engineer opines that "sedimentation will occur during reconstruction regardless of which stabilization and filtration techniques are utilized to help minimize sedimentation, and so some impacts to fish are likely." (Boe Dec. ¶ 11).

Mr. Rhodes opines that the BA did not completely and adequately assess the effects of sediment delivery and its resulting effects on Gumboot Creek and the Imnaha River. (Id. at ¶ 23). He opines that the BA primarily evaluated sediment delivery during the construction phase of the project, but that sediment delivery will also be increased over the long term. He opines that the BA has almost no evaluation of the long term effects

on sediment delivery caused by the reconstruction and keeping portions of the road in the floodplain. He also opines that the BA assumes that fine sediment put in the stream outside the egg incubation period would not have a major effect on survival from egg-to-emergence. He opines that fine sediment will have an adverse effect on the survival of steelhead and chinook from egg-to-emergence. He also opines that the BA assumes that only instream work will deliver fine sediment, while he believes that many other things will also add fine sediment to the streams. He also opines that the BA incorrectly evaluated the significance of project level effects by qualitatively comparing them to the estimated magnitude of the effects of landsliding and existing conditions. (*Id.*).

Mr. Boe opines that the project will cause a considerable amount of sedimentation which will settle on and smother fish eggs and kill young fry in the rearing pools. He opines that the sedimentation is likely to have significant effects on the environment. (Boe Dec. at 4).

In this case, plaintiffs have presented the expert opinion of Mr. Smith. He opines that, despite changes in the project, substantial watershed and fish habitat concerns remained in the form of potential for construction related sediment impacts, substantial risk of future flow events, soil movement, and related in stream sedimentation problems. Mr. Boe opines that sedimentation will have significant effects on the environment, and that mitigation measures cannot prevent sedimentation. Plaintiffs have also presented the expert opinion of Mr. Rhodes. Mr. Rhodes is critical of the adequacy of the BA with regard to: elevated erosion and sedimentation, increased rates of mass failure including landslides, mitigation measures called for in the BA will not eliminate sediment impacts, increased turbidity, prevention of channel migration, prevention of pool development with overhanging banks, removal of additional vegetation, significant amounts of fill in the floodplain, interception of groundwater, alteration of groundwater and surface flow, and allowing livestock access to the creek, and long-term effects of sediment delivery. He is also critical of the BA's evaluation of fine sediment put in the stream outside the egg incubation period. Mr.

Rhodes's opinion is critical of the methodology used in the BA. The BA addresses all of the issues raised by plaintiffs' experts. (AR 690–706).

■ These opinions present a clear example of specialists expressing conflicting views. In such cases, an agency must have discretion to rely on the reasonable opinions of its own qualified experts. *Greenpeace Action*, 14 F.3d at 1332. NEPA does not require the court to decide whether an agency's evaluation is based on the best scientific methodology available or to resolve disagreements among various scientist as to methodology. The court is not empowered to decide that the views of the plaintiffs' experts have more merit than the agency's experts. *Greenpeace Action*, 14 F.3d at 1332–1333.

■ In this case, FHWA, in determining that the project would not have a significant impact on chinook and steelhead or their habitat, relied upon the opinion contained in the BA and the concurrence of NMFS and FWS with that opinion. FHWA has discretion to rely on these expert opinions. *Id.*

Plaintiffs also contend that the proximity of the project to wetlands, wild and scenic rivers, and ecologically critical areas, and the fact that the Imnaha River, a designated wild and scenic river, will experience sediment and turbidity impacts from the project preclude a finding of a CE. The CE stated that the proposed action "has been evaluated for effects to sensitive resources." A CE checklist was prepared summarizing the results. The USFS provided a wild and scenic rivers consistency determination. The checklist stated that the proposed repairs would move segments of the road out of the floodplain/riparian areas and post-construction mitigation work would accelerate recovery and development of the riparian area. (*Id*).

■ Plaintiffs also argue that the presence of threatened species, steep slopes, or floodplains, preclude a finding of a CE. The mere presence of these factors do not prohibit the FHWA from applying a CE to the FR 39 project. *See Southwest Ctr.*, 100 F.3d at 1450 (internal citation omitted). The FHWA considered the presence of both salmon and steelhead, and determining that the project

would not have a significant impact on them. The administrative record also demonstrates that the agency took into consideration the terrain and the location of the floodplain in making its determination that the project would not have other significant environmental impacts.

Plaintiffs also contend that defendants failed to consider the effectiveness of an instream work window in preventing mortality to spawning steelhead. Plaintiffs argue that neither the BA nor the CE explain why the conclusions of the NMFS Draft BO regarding expected impacts of the project on steelhead fry and spawning chinook salmon no longer apply. The revised BA does address this issue. It provides that: "The anticipated work window is between July 15 and August 15. However, to prevent possible sediment effects to incubating steelhead, bull trout, and chinook salmon, the work window will be adjusted based on run and spawning timing in Gumboot Creek...." NMFS concurred with the BA's determination that the project was not likely to adversely affect steelhead and salmon.

■ The court finds, based on the administrative record, that FHWA has taken the requisite "hard look" and based their determination that the FR 39 project would not have significant environmental impacts on a reasoned evaluation of all the relevant factors. There is no evidence that FHWA's determination was a clear error in judgment. There is no evidence that the agency entirely failed to consider any important aspect of the issue. The agency's determination does not run counter to the evidence in the record and it is not implausible; it is supported by the BA and the concurrence of FWS and NMFS. FHWA's determination that the FR 39 project would not have significant adverse impacts is not arbitrary and capricious.

**Presence of Other Unusual Circumstances**

Plaintiffs argue that FHWA's decision to use a CE on the FR 39 project is unreasonable, because of the presence of other unusual circumstances which preclude a CE designation under 23 C.F.R. § 771.117(b).

30. Plaintiffs argue that various environmental organizations, CRITFC, and members of Oregon's Congressional delegation have urged consider-

Plaintiffs contend that the inapplicability of a CE is established by the: 1) substantial controversy regarding the impacts of the project; 2) potential inconsistency of the project with the ESA; 3) potential inconsistency with state and federal water quality laws; potential inconsistency with the HCNRA Comprehensive Management Plan; 4) potential inconsistency with the WWNF LRMP, PACFISH regulations, and the USFS's interim strategy for managing anadromous fish habitat; 5) existence of reasonable, unexamined alternatives that would reduce the threatened impacts;[30] and 6) fact that under USFS regulations, because of the presence of extraordinary circumstances, including steep slopes or highly erosive soils, threatened or endangered species or their critical habitat, and floodplains and wetlands, this project would not qualify for a CE.

In response, defendants argue that: 1) there is no substantial controversy on environmental grounds; 2) the FR 39 project is not inconsistent with any Federal or State laws; and 3) public consideration of alternatives is not required.

■ At oral argument, plaintiffs argued that the USFS should have been designated as the lead agency rather than the FWHA. This contention does not advance plaintiffs' argument. That another agency, under its own rules and guidelines, might have handled a project differently, cannot be used as evidence of unusual circumstances. This would, in effect, be a usurpation of agency discretion to designate the lead agency regarding NEPA. "The designation of a lead agency ... is a matter committed to agency discretion and ... [there is] nothing in NEPA or the regulations suggesting that the courts may overrule the determination by the agencies that are involved that one or more of them will be lead agency or agencies." *Sierra Club v. U.S. Army Corp. of Engineers*, 701 F.2d 1011, 1041 (2d Cir.1983)

**Substantial Controversy**

Plaintiffs argue that substantial controversy between project proponents and other ex-

ation of the Coverdale Option (Berger Dec. Ex. 11–12, 19–24; Boe Dec. ¶¶ 13–14; Bishop Dec. ¶ 7; Rhodes Dec. ¶ 25).

pert agencies regarding the impacts of the project exist as evidenced by objections of various conservation groups, CRITFC, ODF & W, and Oregon's Congressional delegation. Defendants argue that the following evidence in the record demonstrates that there is no substantial controversy on environmental grounds regarding the FR 39 project: 1) the general public supports the project (AR 378, 493–494, 551, 816–849, 856); 2) the opposition letters from environmental organizations and the congressional delegation do not provide any factual or scientific basis for their opposition, the letters were written prior to the revision of the project, and the letters do not take into account the information contained in the December 9, 1997 BA including construction and post-construction mitigation measures (AR 261–262, 332, 335–336, 339–345, 388–390, 460, 480–481, 485); FHWA responded to the concerns expressed in the letter from CRITFC, and CRITFC did not raise any further concerns about the impacts on fish habitat (AR 375–376); and ODF & W does not object to the project.

 Section 117.117(b) provides that: "Any action which normally would be classified as a CE but could involve unusual circumstances will require the Administration, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper. Such unusual circumstances include: ... (2) Substantial controversy on environmental grounds ...." 23 C.F.R. § 117.117(b). "The burden of establishing substantial environmental issues is on the plaintiffs." *Public Interest Research Group of New Jersey, Inc. v. Federal Highway Admin.*, 884 F.Supp. 876, 888 (D.N.J.), *affirmed*, 65 F.3d 163 (3rd Cir.1995).

 "The term 'highly controversial' refers to instances in which 'a substantial dispute exists as to the size, nature, or effect of the major federal action rather than the mere existence of opposition to a use.'" *Friends of the Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1557 (2nd Cir.1992)(internal citation omitted). "[A] substantial dispute exists where the agency received numerous responses from conservationalists, biologists, and other knowledgeable individuals, all highly critical of the ... [agency's determinations and conclusions]." *Greenpeace Ac-*

*tion*, 14 F.3d at 1334. (internal citation and quotations omitted). However, in cases where "virtual agreement exists among local, state, and federal government officials, private parties, and local environmentalists, criticisms of the plaintiff and its experts are not sufficient to demonstrate the existence of a public controversy." *Id.* (internal citation omitted).

 Opposition to a project, by itself does not trigger an agency's duty to prepare an EA or an EIS. *West Houston Air Committee v. F.A.A.*, 784 F.2d 702, 705 (5th Cir. 1986). In addition, "the existence of a disagreement as to whether an EIS should be commissioned is not by itself grounds for a court to require an EIS." *Roanoke River Basin Association v. Hudson*, 940 F.2d 58, 64 (4th Cir.1991), *cert. denied*, 502 U.S. 1092, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992). An agency is required to consider the comments of other agencies, but it does not have to defer to them when a disagreement exists. *See Id.*

In support of their contention that a substantial controversy on environmental grounds exists, plaintiffs cite letters from various conservation groups, letters from members of Oregon's congressional delegation, and a letter from CRITFC. As pointed out by defendants, all of these letters were submitted prior to the revision of the FR 39 project. (AR 261–262, 332, 335–336, 339, 388–390, 460, 480–481, 485). In addition, the majority of these letters do not provide specific criticisms of the FR 39 project. Instead they contain general remarks regarding concerns that the project may have an adverse impact on fish habitat and that the FHWA should consider the "Coverdale Option." (*Id*). The letter from CRITFC contains specific criticisms of the project, and FHWA responded to these concerns stating that FHWA was working with USFS and NMFS biologists to avoid, minimize and/or mitigate adverse affects to fisheries. Their response also discusses the specific proposed mitigation measures. CRITFC did not respond to this letter with any additional criticisms. There is nothing in the record that demonstrates any additional criticisms from any of these groups based on the revised project.

The record demonstrates that FHWA worked closely with other state and federal agencies to revise the project to avoid adverse impacts to salmon habitat. The record reflects that NMFS, FWS, the Corps, and the FHWA all found that the proposed project would not have an adverse affect on chinook salmon, steelhead, or their habitat. (AR 174,670–671, 676–677, 701, 852–855, 857–860, 861–869). The fact that Mr. Smith of ODF & W felt that an EA or an EIS would be appropriate does not by itself render FHWA's determination that no substantial controversy exists on environmental grounds arbitrary and capricious.

The court finds that plaintiffs have failed to establish that FHWA's determination that no substantial controversy exists on environmental grounds was arbitrary and capricious.

**Potential Inconsistency with State and Federal Laws**

Plaintiffs contend that the inapplicability of a CE is established by: 1) the potential inconsistency of the project with the ESA—plaintiffs argue that the FR 39 project will result in significant increases in sediment delivery to chinook spawning and rearing habitat and result in elevated mortality of chinook during egg emergence and later life stages, which in turn will result in the taking of threatened chinook in violation of the ESA (Rhodes Dec. ¶ 23), and FHWA and USFS have not obtained an incidental taking statement from NMFS; 2) potential inconsistency with state and federal water quality laws—plaintiffs argue that the sedimentation caused by the FR 39 project presents a high risk that both the sedimentation and turbidity standards for the Grande Ronde Basin will be violated; 3) potential inconsistency with the HCNRA Comprehensive Management Plan; and 4) potential inconsistency with the WWNF LRMP, PACFISH regulations, and the USFS's interim strategy for managing anadromous fish habitat (Rhodes Dec. ¶¶ 11–14). Defendants argue that the FR 39 project is not inconsistent with any Federal or State laws.

"Any action which normally would be classified as a CE but could involve unusual circumstances will require the Administration, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper.

Such unusual circumstances include: ... (4) Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action." 23 C.F.R. § 117.117(b). As discussed earlier, "when specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Greenpeace Action,* 14 F.3d at 1332 (internal citation and quotations omitted). Even when a plaintiff presents expert opinions raising questions regarding an agency's analyses, methodology, and conclusions, such opinions have been viewed by the courts as "a difference of scientific opinion." *Id.* at 1333. NEPA does not require the court to decide whether an agency's evaluation is based on the best scientific methodology available or to resolve disagreements among various scientists as to methodology. *Id.* (internal citation and quotations omitted). The court is not empowered to decide that the views of the plaintiffs' experts have more merit than the agency's experts. *Id.* If the court is satisfied that an agency's "exercise of discretion is truly informed, the court must defer to 'th[at] informed discretion.'" *Id.* at 377. (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

In support of their position that the FR 39 project is inconsistent with various federal and state laws, plaintiffs rely upon the opinions of Mr. Rhodes, statements contained in the draft BO prepared by NMFS on the original FR 39 project, and statements contained in a revised draft of the HRNRA Comprehensive Management Plan.

Defendants argue that FHWA complied with the ESA by having the USFS prepare a BA which concluded that the project was not likely to affect salmon, steelhead, or bull trout (AR 705) and referring the BA to the NMFS and FWS for their concurrence with that finding (AR 854). It is clear that FHWA complied with the ESA by having the USFS prepare a BA and referring that BA to the NMFS and FWS. FHWA may properly rely on the expertise of the USFS, NMFS, and FWS, who all determined

that the revised FR 39 project was not likely to adversely impact salmon, steelhead, trout, or their habitat. The fact that plaintiffs' expert disagrees with this conclusion does not render FHWA's decision that the FR 39 project was consistent with federal and state laws arbitrary and capricious.

Defendants also argue that the FR 39 project complies with the CWA and Oregon's water quality standards as evidenced by the issuance of the Corps Nationwide Permit No. 3 and the DSL permit. (AR 163–179, 223–225). The Oregon DEQ has pre-certified that work covered by a Nationwide Permit No. 3 complies with applicable provisions of the CWA. (AR 350). FHWA relied upon the expertise of DEQ, the Corps, and the DSL in determining that the proposed FR 39 project was consistent with the CWA and Oregon's water quality standards. FHWA may properly rely on the opinion of agency experts.

Defendants argue that the FR 39 project is consistent with HCNRA Act, WWNF LRMP, and PACFISH standards (AR 88, 244, 690–694, 854, 861–862). The Level 1 Team and the USFS found that the FR 39 project was consistent with PACFISH and WWNF LRMP. (AR 88, 691, 854–855). The USFS also determined that the project was consistent with the HCNRA Comprehensive Management Plan. (AR 690–694). FHWA relied upon the findings of agency experts in determining that the FR 39 project was not inconsistent with state and federal laws. FHWA's determination was not arbitrary and capricious. The repair of FR 39 is not inconsistent with the HCNRA Act which provides for "the continuation of existing uses . . . ." 16 U.S.C. § 460gg–4(7).

**Unexamined Alternatives**

Plaintiffs argue that the presence of an alternative route for FR 39 presents an extraordinary circumstance, and precludes application of a CE. Defendants argue that neither CEQ nor FHWA regulations require public consideration of alternatives to actions that are covered by a CE, and under FHWA regulations the presence of alternatives does not constitute an extraordinary circumstance.

"Any action which normally would be classified as a CE but could involve unusual circumstances will require the Administration, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper. Such unusual circumstances include: (1) Significant environmental impacts; (2) Substantial controversy on environmental grounds; (3) Significant impact on properties protected by section 4(f) of the DOT Act or section 106 of the National Historic Preservation Act; or (4) Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action."

23 C.F.R. § 117.117(b)

The presence of alternatives does not constitute an unusual circumstance. In addition, under CEQ regulations, an agency may consider alternatives when applying a CE, but is not required to do so. *Mahler v. U.S. Forest Service*, 927 F.Supp. 1559, 1573 (S.D.Ind.1996). FHWA's alleged failure to publicly consider the "Coverdale Opinion" does not render its determination that no unusual circumstances were present arbitrary and capricious.

**Need to Prepare an EIS**

Plaintiffs argue that, because they have shown beyond a doubt that the FR 39 project may have a significant impact on the environment, defendants are prohibited from using a CE and must prepare an EIS before taking further action. Defendants argue that FHWA's determination that the FR 39 project qualified for a CE was not arbitrary and capricious, and, therefore, an EIS is not required. The court has determined the FHWA's decision to apply a CE to the FR 39 project was not arbitrary and capricious. Therefore, under FHWA regulations, FHWA does not have to prepare an EIS. 23 C.F.R. §§ 771.115, 771.117.

**Issuance of a Permanent Injunction**

Plaintiffs argue that there are no genuine issues of material fact which prevent judgment in their favor, and that a permanent injunction should be issued by the court. Plaintiffs argue that injunctive relief is appropriate because: if the FR 39 project is allowed to proceed without full environmental analysis, irreparable harm to threatened chinook and steelhead is likely to result; the

public interest favors an injunction; and any harm to defendants is negligible.

Defendants argue that plaintiffs are not entitled to an injunction because plaintiffs will not suffer irreparable harm, and the public interest does not favor issuing an injunction.

 In the Ninth Circuit, courts may apply one of two preliminary injunction tests. *Ali v. United States,* 932 F.Supp. 1206, 1209 (N.D.Cal.1996). Under the first test, the party must show: 1) irreparable injury; 2) probability of success on the merits; 3) the balance of equities in their favor; and 4) if the public interest is involved, the granting of the injunction is in the public interest. *Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir.1994)(internal citation omitted). Under the second test, the moving party must demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardship tips sharply in their favor. *Id.* Even if the balance tips in their favor, they must still show a fair chance of success on the merits. *Id.* If the balance tips sharply in favor of the plaintiff, less likelihood of success on the merits is required. *Wilson v. Watt,* 703 F.2d 395, 399 (9th Cir. 1983). In addition, the party must also show an inadequate remedy at law. *Stanley,* 13 F.3d at 1320. The standards for a permanent injunction are the same as a preliminary injunction, except the moving party must show actual success on the merits, instead of probable success on the merits. *Amoco Production Co.,* 480 U.S. at 546 n. 12, 107 S.Ct. 1396.

 "Irreparable harm is injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2nd Cir.1995). Injunctive relief is appropriate when the moving party demonstrates irreparable harm and inadequacy of legal remedies. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)(internal citation omitted). The "court must balance the competing claims of injury and must consider the effect on each party

the granting or withholding of the requested relief." *Id.* "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 545, 107 S.Ct. 1396. The court will not issue an injunction if it "might actually jeopardize natural resources". *American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 966 (9th Cir.1983).

 "The court must weigh and consider the public interest in deciding whether to issue an injunction". *Seattle Audubon Soc. v. Evans,* 771 F.Supp. 1081, 1095 (W.D.Wash.), *affirmed,* 952 F.2d 297 (9th Cir.1991)(internal citations omitted). An administrative agency's failure to comply with the law "invokes a public interest of the highest order: the interest in having government officials act in accordance with the law." *Id.* at 1096 (internal citation omitted).

 "In determining whether to issue an injunction where statutory violations have occurred, the court must engage in a two-part analysis." *Id.*(internal citation omitted). First, the court must determine whether the statute restricts the courts equity jurisdiction; whether the statue would either require or preclude the issuance of an injunction. *Id.* Second, if there is no limitation, the court must balance the equities to determine the appropriateness of an injunction. *Id.* If the court finds NEPA violations, an injunction is the appropriate remedy. *See Forest Conservation Council v. U.S.F.S.,* 66 F.3d 1489, 1496 (9th Cir.1995). However, an injunction should not automatically issue. *Id.* Instead, defendants should be given an opportunity "to present evidence of unusual circumstances that weigh against the injunction sought, and to present evidence to assist the court in fashioning the appropriate scope of whatever injunctive relief is granted." *Id.* (internal citations omitted).

██ Plaintiffs have failed to establish actual success on the merits. In addition, the court finds that the equities do not balance in plaintiffs' favor. Defendants have presented

evidence of substantial economic impact on the local community due to delays in the reconstruction of the project. In addition, there is evidence in the record that delay in repairing the road will lead to additional environmental damage to Gumboot Creek. Therefore, plaintiffs' request for an injunction is denied.

## IV. *ORDER*

Based on the foregoing, it is ordered that plaintiffs' motions for summary judgment and for permanent injunction are denied; and defendants' motion for summary judgment is granted. This case is dismissed and all pending motions are denied as moot.